Final day of the 4th Circuit term for March and we are happy, Judge Harris and I are happy to have John Preston Bailey from the Northern District of West Virginia sitting with us today. So the first case, Carrington, Mr. Bartos. May it please the Court. Good morning. My name is Richard Bartos. I represent all five appellants in this matter. In the lower court I represented Joseph Young. So I would first like to thank you for having us. I know oral argument is not always granted and I appreciate the opportunity to come down here and talk to you about this case. So I'd like to begin with this. I just want to say something. I think what's happened is outrageous. It's absolutely outrageous and I think the U.S. Attorney's Office has let me down. I just want to make it perfectly clear on the record that I think that the U.S. Attorney's Office should be ashamed of itself, the assistants involved should be ashamed of themselves, Mr. Rosenstein should be ashamed of himself to allow this to happen. I've been let down, the Court has been let down, and the government has created this situation. Is this about the instructions? Yes, ma'am. One question I have is I do understand that it took a long time to get there, but at the end of the day it was the defense's instructions that were given to the jury, right? At the end of the day, yes, it was after the jury had been sent out, deliberated for a full day, been misinstructed multiple times, and told to disregard all of the closing arguments of counsel that dealt with the original instruction. Then the correct instruction was ultimately given to the jury. And the jury verdict forms were the ones that the defense wanted, right? That's correct. And when you look at the verdict forms, tell me how I can look at those verdict forms and think that the jury was confused and didn't understand that it had to find the racketeering acts for each defendant. Because by that point, Your Honor, it was far too late. Well, what do you think they were doing when they checked those boxes? I have no idea. I don't think they knew either. Can't we assume that when they checked the boxes, they checked them because they found those racketeering acts for each defendant? Yes, ma'am, absolutely. And I think you can conclude, both from the evidence of the case and the verdict forms, that a jury could reasonably, and this jury did, find that these individuals conspired to commit these acts. The problem here is that the case is not about what happened at the end. The case is really about what happened at the beginning and all the way through. Because by the time the jury got to that verdict form, this case had been so unbelievably tainted and disturbed by the government's own actions that that verdict form no longer has any validity. But despite that claimed taint, the jury seemed to have it figured out when they asked the question. The jury did ask the question, and what was interesting was the government had persisted in telling the court that this instruction was correct when it wasn't. The government had persisted in saying that it was straight out of sand when it was not, word for word out of sand when it was not. When the jury came back with the note, you would think that the government would then say, okay, I see what the problem is here. But instead, the judge says, I think we need to tell them it's the racketeering acts, A through F, in the indictment. And the government opposed that. The government said, no, we want you to tell this jury that it's the 161 overt acts. You know, I actually read that a little bit differently. And this is one of the reasons I'm a little bit worried about trying to parse out everything that happened before we get to the actual instructions given to the jury. But I thought the government was concerned at that point, or at least it looked from the page, as though the government was thinking that overt acts might be necessary, not so much that they were sufficient, but that in addition to the racketeering acts, the jury needed to find some overt acts as well, which turned out not to be true. But it seemed like there were a lot of different conversations going on here. Yes. And the conversations on sort of, I guess, on a dry reading or somewhat difficult to follow, which is another reason I think there was a problem for the jury. But what happened was the note comes back, and the note, Judge Bailey, is absolutely right. It said, which are we supposed to find? And Judge Motz comes out and he says, the note says, what are the racketeering acts under count one? What are the racketeering acts under count one? Are they A to F found in the instructions? Are they the overt acts? And the judge says, I think the thing to do is to answer A to F. And the government says, the government does not agree with that. Right, because the government thinks you also have to find overt acts. But I don't read the government as saying, don't tell them A through F. I think the government is saying, tell them A through F, but also tell them to find two overt acts. Well, what the government told them in their rebuttal closing argument was. Well, that's different. That's a whole different conversation, a different time. Look, I understand what you're saying. This was very messy. It wasn't a perfect process. But at the end of the day, the jury got the right instructions. At the end of the day, the jury got the right instructions. So what exactly is your claim? Because the day was so flawed that the integrity of that verdict can't stand. And why not? I guess, I mean, I don't. What can you point to that tells me there was some kind of a massive structural defect in this trial that would require a new trial? What exactly do you mean? Well, so the indictment itself lists 161 overt acts. And you are correct that overt acts can be found by the jury, but what they have to find is racketeering acts. We, as the defendants, pointed this out repeatedly. The government insisted on blurring them. And the reason it matters that they blurred them is there's two reasons. The first is that about 20, 25 of the overt acts are not racketeering acts. They're not racketeering at all. Some of them aren't even illegal. They put in the indictment that members of the staff were having sexual relations with the inmates. That's not even illegal. But they put them in as an overt act. My client in particular, the vast majority of the information about my client was that he was importing tobacco, which is illegal in the state but not a federal offense, but it's listed as an overt act. And so when you confuse the two and you tell the jury you have to find two of these overt acts, what you're saying is we are watering down our burden. We are telling you you can find these men guilty and women guilty even if you don't find, if you find that what they did wasn't even racketeering acts. Now, they did ultimately. However, you would agree that the overt acts checked off by the jury were in fact overt acts. Yes, ma'am. Yes, sir. Absolutely. And so all the other stuff, isn't that just describing the overall conspiracy of all these things went on? But you still got to find the overt act. And had that been the instruction, had that been the way the case had been tried, that would absolutely be true. But what happens is the jury is told to find overt acts. The jury comes back and says, is it overt or racketeering? And the judge says, the judge's instruction in answering that question, he says, I hope my answer doesn't confuse you too much. So the judge understood that this was confusing. In fact, it was confusing to the judge himself because he tries to explain that it's a racketeering act to get it straight. And then he says, when you answer the question about racketeering acts, you are making factual findings which are sort of listed in the overt acts. So even the judge in answering the question is confused about what's going on and still confuses it to the jury. When the government is giving its closing argument and talks about the overt acts, the judge says, well, you mean racketeering acts, as if they're the same. And they're plainly not. So there's no question that at the end of the day, the jury made a finding that these people had committed these racketeering acts. What this case is about, however, is the structure, the integrity of the trial that led to that. And so what we have here is we have an indictment that was, in our opinion, was flawed. But even though overt acts can be listed for the conspiracy, you have an instruction that was intentionally, knowingly incorrect. And I say that. One of the things that's been nagging at me is when they said this is straight out of sand, why didn't one of you say, no, it's not? Here's what sand says, and it's different. We tried, Your Honor. We stood up. We tried. And Judge Mott said, I don't want to hear it. He said, you know, I'm going to be here all day. We're not going to take all day to do this. If you have a specific thing, we can talk about it. But we're not going to talk about anything that is one of the form instructions. And what interesting happened was the government that morning had submitted an instruction on unanimity and said it was straight out of sand. It's exactly out of sand. It was not. In fact, it said that they had to be unanimous in finding overt acts. Never mention racketeering acts. Afterwards, my co-counsel went over to the government and said, where is this instruction? And the government counsel opened his book and could not, his book was so old that even the site for that instruction wasn't in there. So they kept saying these are straight out of sand. And as defense counsel, as any counsel in the district courts, Your Honor, I'm sure, you know, you don't want to be arguing about what's in sand, right? If the government says this is what sand says, you don't need defense counsel saying, oh, well, we don't agree with that. Well, I got a copy of sand. I keep looking at it. I'm glad to hear that. So that's what happened. And if you read the charge conference, Judge Motz came out and said, we're not having a long discussion about this. You got something specific. You can raise something specific. And we tried. We said we submitted an alternate RICO instruction. Judge said, I don't want to hear it. And so there was no opportunity to go through that. But we made clear during the trial that we disagreed, and we raised our objections after the judge gave the improper instruction. So what happened was the government creates this, and I say created intentionally for two reasons. The first is that not only did they add things to the sand instruction by putting in all this stuff about overdraft, but they took out the nexus requirement in the RICO case. They deleted portions of the sand instruction. So to stand up and say this is word for word from sand is very problematic. You're not asking us to adopt a per se rule that if a judge instructs a jury and sends them to deliberate and says, oops, I made a mistake. That's not in up-to-seventh era. That's correct. So he can bring them back, and he can correctly instruct them, which I understand he did in this case. Yes. And, in fact, gave your charge. So I'd be sympathetic with you if it were on the third day, but this is on the first day of a four-day deliberation. Yes, and in other situations where there's just a mistake, you say, well, we thought it was this. The judge thought it was that. We made a mistake.  This was not a mistake. This was starting an opening statement. You know, it's interesting because the government in its brief says, we didn't even mention racketeering acts in our opening statement. That's not a solution. That's the problem. We were in a racketeering case. So from the very beginning of this case and throughout the questioning of witnesses and throughout argument and throughout the instructions, this was flawed. The entire case was tried by the government on a knowingly incorrect legal theory. Since you're representing Mr. Young, you might want to talk about sentencing error, if any, as Mr. Young. More than almost anything, Your Honor. Thank you. Yes, so part of the problem that we had with this particular judge was we never really got findings on things. We didn't get a chance to argue for a mistrial after the wrong instruction was given. The judge said, I don't want to hear it. We've been in trial too long. When it came time for sentencing on Mr. Young, there was a huge dispute over the drug amounts. The government's position was, well, everybody else pled to offense level 20, so that's what Mr. Young has to do. I said, no, that's not true. You have to make actual findings. The pre-sentence report said, we're going to leave it up to the judge. The judge never made any, made no findings, didn't adopt the pre-sentence report, didn't make any findings on the drug amounts, didn't make any specific findings on the offense level, was still confused, as he said, about the money laundering aspect. The only thing he said was, I think it's offense 30. That's it. And this Court has been very clear that in order to review a sentencing, you need to have some findings to review. There were no findings for you to, you have nothing to look at, unfortunately, for Mr. Young. So at a minimum, and I know I represent all the appellants, but at a minimum I would like to be able to, I would ask you to remand for resentencing, particularly for Mr. Young. Yes, Judge. Can I ask you about Paler's sentencing? Was it enough to resolve, was there also a dispute there about the drug attribution amount? Yes. And was it enough to resolve that, that the district court adopted the findings of the PSR? Because there, at least, the PSR did purport to resolve the dispute, right? Yes. If the court, if the, in my, I don't, I haven't read that because it's sealed, but in my situation, the pre-sentence report expressly said we're leaving this up to the judge under 6A1.3. If that's what they said in Paler, then it would not be. If the pre-sentence report said these are our findings and the judge said I adopt those findings, then yes, this Court has said you don't have to repeat them if you adopt them. In Mr. Young's case, he adopted nothing and found, and held nothing. Thank you. I'm sorry. Can I just, one very quick question. On the Fourth Amendment issue, so there was a suppression motion, right, that the search of Paler's phone was unconstitutional because the warrant had expired. Did that get ruled on? Yes, Your Honor. Tell me where it is in the record. Is there a written order, an opinion, anything? Your Honor, my time is up. May I adjust that in rebuttal, first thing? Yeah, sure. Thank you. Thank you, Your Honors. Mr. Harding? Who's arguing? You've got Mr. Harding down here. That's your name? Yes, thank you, Your Honor. Okay. Yes. To please the Court, my name is Robert Harding. I was the lead prosecutor in this case. I want to begin, if I may, by reminding the Court that it's what the jury was thinking and what the jury believed that is important here. A month before the trial started, both the government and the defense filed their joint requested instructions, and the defense filed, in addition to the defense requested instructions, the government filed theirs also. The government instructions had no instruction on membership of the conspiracy. Both the joint instructions and the defense instructions spoke of overt acts rather than racketeering acts. In fact, the defense instructions asked the Court to include all 160-odd overt acts in the instruction that the Court gave to the jury. But the important point here is, Your Honors, those documents never made it to the jury, of course, and the judge ignored them when he wrote his instruction. The actual instruction that he gave in court was not based on the joint instruction or the defense instruction. He instead based his instruction on sand. It's the sand and siffert instruction, and it included a clear requirement that the jurors find unanimously two racketeering acts for each defendant that were parts of the six types of racketeering activity charged in paragraph 11 of the indictment. The jurors were told to find two for each defendant. The defense has claimed in their reply brief that the jury was never told correctly to find two racketeering acts. The truth is that they were always told that, even in the judge's initial instruction. The mistake in the initial instruction was exactly as Judge Harris pointed out earlier. The government had requested an additional instruction that the jurors be told to find two racketeering acts, and the judge inserted a sentence into the sand and siffert instruction that told the jurors to find two overt acts for each defendant. That is an error, but it is a very limited error because nothing was dropped from the sand and siffert instruction, and there was no conflation of the racketeering acts with the overt acts. Instead, the jurors were told to do something the law did not require, something that, according to the Second and Tenth Circuits in Appling and Randall, the jurors shouldn't be told at all because the overt acts are not elements of the offense. By the way, the judge's actual instruction that he gave to the jury on January 27th is largely omitted from the joint appendix. Only the tail end of it appears in the joint appendix. If you want to see the complete instruction, you have to turn to the supplemental joint appendix because we made sure it was in there at pages 3501 and 3502. The juror's note that we've already talked about shows that the jurors did not conflate racketeering acts and overt acts. Instead, they clearly differentiated them. What is meant by racketeering acts under count one, the jurors asked? Are they A to F found on page 19 of the instructions? Are they the overt acts listed in the indictment? So they clearly differentiated these two lists. They just wanted to know which ones they should refer to in responding to the court's direction that they find at least two of those for each defendant unanimously. The judge's answer to the note repeated his jury instruction, which was that they should find two racketeering acts and two overt acts for each defendant. And it was that that caused me to do a little legal research and come up with the Appling and Randall cases and write my letter to the court. But there is no evidence, Your Honors, that the jurors conflated overt acts with racketeering acts. When the court re-instructed the jury on February 2nd, actually it was Judge Blake who came in to re-instruct the jury on February 2nd because Judge Motz had gone out of town. They were told to focus their attention only on the racketeering acts. There was no mention of overt acts. And there were no more notes from the jury on this subject. The jury continued to deliberate for several more days until they reached their verdicts on February 5th. As Your Honors have already pointed out, the verdict sheet is vivid evidence and a vivid illustration of how clear-headed the jurors were in their job of finding the racketeering acts because the judge didn't simply give them a unanimity instruction and tell them to find two racketeering acts for each defendant. He required that they indicate in writing on the verdict sheet exactly which racketeering acts they found for each defendant. And the jurors did this very conscientiously. They found five racketeering acts, for example, for Mr. Young. They only found three for Mr. Carrington. They found three for Ms. McNair also, but they weren't the same three. They clearly went through each racketeering act, reflected on what the legal terminology in the racketeering act meant, and compared it to the facts that they recalled from the testimony and made their decisions in that fashion. The judge, of course, provided in his jury instructions complete definitions for all the terms in the racketeering acts. In the end, the jury actually acquitted three of the defendants in this trial. The five defendants on appeal are the ones who were convicted. There also was no structural flaw in this case, Your Honor. The error in this case occurred at the very end of the trial, after all of the evidence was in, after the jury instructions were in. There was, of course, the error in the one jury instruction itself, but the error was in a compressed time period. That's the point, at the very end of the trial. The defense attorneys apparently didn't feel this is adequate to constitute an issue for appeal, so they have sought to construct this elaborate fiction about a structural flaw going all the way back to when the government indicted this case. There are many factual errors and even some legal errors in the course of constructing this fiction. One of the legal errors is the defense belief that you just heard from Mr. Bardos that the overt acts in a conspiracy must be themselves criminal acts. This is in conflict with the common law rules of conspiracy, which the Supreme Court said in Salinas apply to racketeering conspiracies. There is no overt act requirement in the common law of conspiracy, and an overt act need not itself be a criminal action. It can be a perfectly innocent act. This court has made that clear in its own rulings, and I cited the case in my brief. So Mr. Bardos is quite wrong in believing that that was an error. That error, however, pales in significance compared to the factual misrepresentations in the defense brief, including, for example, their claim that the government, quote, freely interchanged the terms overt acts and racketeering acts in arguments and questioning witnesses throughout the trial. There is not a single example of that in the whole record of this case. The first use the government made of the phrase racketeering act occurred in the rebuttal argument on January 28th. And you all are conceding that that was a bit of a problem, that in the rebuttal argument it got mixed up. It got mixed up, yes, but actually it was the judge that interjected and directed the government to use the term racketeering act at that point. That was an error, and I had that in mind when I requested the re-instruction in this case. The main problem I had noticed was what Randall and Appling said, which was that there is no need for an overt act instruction at all. But I recalled that the judge had made that direction in the middle of the rebuttal argument, and that was one of the reasons I sought the re-instruction. But actually that confusion did not occur in the judge's actual instruction. He differentiated the racketeering acts clearly from the overt acts in his instruction that he gave to the jury. This use of racketeering act for the first time on January 28th was the first time that the phrase had been used in the trial at all by any party, going back all the way to November 19th when Mr. Bardo's used it fleetingly in his opening statement. The mistaken instruction, your honors, to find two overt acts could not have had any effect on the way the evidence came in in this case or on the arguments of counsel. When the corrected instruction was read to the jury by Judge Blake, this is the instruction that was based on the defense requests and which the government agreed to, the judge also gave all counsel the opportunity to argue again before the jury. And no defense counsel took that opportunity. Judge Blake discusses this on page 2309, 2310 of the joint appendix. No defense counsel took the opportunity to re-argue anything after the new instruction was given on February 2nd. So the idea that there was a structural flaw in this case, in this trial, is preposterous. On pages eight and nine of the reply brief, defense counsel completely misunderstand what the government was trying to do by citing Appling and Randall. The defense seems to think that we cited these for the proposition that overt acts were the same as racketeering acts. We never said any such things. The cases stand for the proposition that no instruction as to overt acts is required at all in a WICO conspiracy case. I'd like to address the issues that Mr. Vardos just raised about the sentencing of his client, Mr. Young. I call the court's attention to page 2484 of the joint appendix. It's true that the judge did not make detailed factual findings on the sentencing of Mr. Young. Did he make any factual findings? Were there some that were not detailed? He made the crucial finding on page 2484. He said he knew what was going on. That means that the judge rejected Mr. Vardos' argument that Mr. Young didn't know about all the other drugs that were floating around in this conspiracy. That was Mr. Vardos' whole reason for rejecting the PSR's application of the drug guidelines here. He claimed that his client didn't know about the other drugs in the conspiracy, and Judge Montz clearly rejected that at the sentencing proceeding. He also expressly adopted the Chapter 2 findings in the PSR in his JNC. He adopted the findings of the PSR with the exception that he imposed two levels rather than four or three. But isn't the problem that the PSR didn't make findings? The PSR said we're going to leave it to the district court, and then the district court said, well, I'll adopt those findings. It's like two people pointing at each other. Well, the government's position here is that the judge made the crucial finding as to drug quantity when he rejected the defense argument that his client, Mr. Young, could not foresee the rest of the drugs that were floating around in this conspiracy. But that doesn't meet the requirement of a particularized finding as to drug quantity, does it, as to Mr. Young? Well, the PSR makes the particularized findings. No, it doesn't. The PSR does indeed refer to the court to finally determine it, but the whole ball of wax turned out to be the question of whether Mr. Young could foresee the rest of the drugs in the conspiracy. And that was the finding that the court made that rejected. Your Honor apparently doesn't understand this interpretation, but I'm trying to put this into context. This was one of 44 defendants in this case. All of the rest had been found to be at level 20 because the amount of drugs that are needed to place a defendant at level 20 are tiny. 5.9 grams of oxycodone, that's all that was required, and that's in the PSR for Mr. Young. So the judge had already been through this with other defendants, and he abbreviated the whole issue by simply rejecting Mr. Young's claim that he could not foresee the rest of the drugs in the conspiracy. As I recall, the PSR left open, noted and left open two factual issues and distinguished them, the drug attribution and then the enhancement for role in the conspiracy. It said there are factual issues as to both of these things. We're not making factual findings. We're leaving that to the district court judge. And is your position that when the district court judge said he knew what was going on, he made a specific factual finding as to both drug attribution and role in the conspiracy, that's sufficient for an individualized sentencing of Mr. Young? Through that phrase, he knew what was going on. It doesn't apply to the role enhancement at all. Okay. Well, then that's a problem, right? Because that's another open factual dispute on which the PSR expressly says we're not making a finding. The PSR recommended a four-level enhancement. But it made no finding, and it said we leave that to the district court. Yes. So you would concede that that finding has not been made by anyone? Yes. Okay. Well, then don't we need to send it back so someone can find the facts in this case? Yes, Your Honor. Okay. Thank you, sir. Ms. DeCaio. Your Honor, I believe my time is now at 5 since Mr. Harding took two minutes. We'll give you some. May it please the Court, my name is Ayn Ducal. I also represent the government. I'll be discussing the sentencing issues raised specifically by Mr. Paler, as well as the Fourth Amendment claim that Judge Harris asked about. With regard to Mr. Paler, I think that can be dealt with, the sentencing issue at least, I think that can be dealt with fairly briefly, as Judge Harris pointed out. The PSR, with regard to Mr. Paler, specifically adopted the government's laying out of the factual basis for the drug quantity. And the district court adopted the PSR's laying out of the factual finding for the drug quantity. The PSR also adopted the two-level enhancement for abuse of trust. And at Joint Appendix 2771, the district court in its JNC said that it was adopting the PSR. So with regard to Mr. Paler, there were sufficient factual findings for the disputed issues of drug quantity and abuse of trust. And very briefly, even if the district court had committed error in computing the sentencing guidelines with regard to Mr. Paler, the district court was very specific in saying that this was a sentence it would have imposed regardless of the guidelines. The district court felt that the guidelines were, in fact, too low in this case. The district court went through the various 3553A factors that motivated its sentence. It discussed the nature and circumstances of the crime, both in a macro level and in a micro level. The district court discussed the systematic breakdowns that led to this case, and as well the fact that in this jail, the correctional officers had let basically the inmates run rampant. The district court discussed personal factors with regard to Mr. Paler, including his potential addiction, and as well it discussed that it believed the witness that had testified at sentencing that Mr. Paler was still involved in drug distribution in the jail that he was currently housed in. So the district court addressed the need for specific and general deterrence. So this is a reasonable sentence, even if this court were to find that the district court had error in computing the guidelines, but of course the government submits that the district court did make sufficient factual findings. With regard to the Fourth Amendment claim, Your Honor, this was the subject of much pre-trial and during trial litigations. I believe there were at least five filings by Defendant Paler with regard to the search of this cell phone. To answer the question that you had posed to Mr. Bartos, Your Honor, I don't recall if there was a specific written order by the court. I couldn't find anything. But I think, Your Honor, it was clear from the motions hearing and certainly at the trial that this evidence, the cell phone evidence, was coming in. So these issues that are being raised before Your Honors were raised below, and so the district court, both the motions judge as well as the trial judge, rejected these arguments. Yeah, I was just wondering if I could learn anything about those judges' reasoning anywhere in this record, but it seems not. I don't recall that, Your Honor. I was trying to recall whether that. Well, can you just tell me why it didn't violate the Constitution to search after a warrant had expired? Well, first, Your Honor, federal rule of criminal procedure 41E2B specifically exempts from the typical 14-day expiration date. It specifically exempts the later review of electronic devices. Certainly there are many practical reasons for this. It is very difficult for certain technological reasons to get into devices. And in this particular case, Mr. Poehler's phone. Right, I totally understand that. It's just, it's what I'm, I get all of that. Yeah, so in this case, though, first the phone is seized, you know, pursuant to a valid search of the home, right? So the phone is seized, and then you get a search warrant. But you're saying that under that rule, the search has basically already occurred. The search occurred, was executed when the phone was originally seized, right? Yes, Your Honor. So what's the point of getting, it's a weird sequence of events. And then you got a search warrant that you say, I mean, I guess has already been executed because the phone has already been seized? Your Honor, in our district, it is the common practice to typically get a search warrant for a location and be able to seize electronic devices at that location. And then get a later search warrant in order to search the phones themselves. That seems like a good practice. But the fact that the search warrant said 14 days really just had no meaning at that point. Because under this rule. I would say yes, Your Honor. Under the terms of this rule, which specifically discusses later review and off-site copying, that the language of the rule itself in specifically carving out electronic devices, the later review of them, I would say yes, the 14-day rule doesn't apply. But I would say also, Your Honor, even if you were to find that the 14-day rule applied in this case. Not the rule, but the fact that the warrant itself said you have to execute this warrant within 14 days. I mean, the warrant, it seems to me, sort of expired after 14 days. And at that point, you didn't have a warrant anymore. Well, I would say, Your Honor, that the search could not be, it is clear from the record that the search could not be completed within the 14 days. So why didn't you say that to the magistrate and say, please don't give me this 14-day limit because I'm not going to be able to do a search in 14 days? Well, Your Honor, we didn't know whether we could get into the phone or not until the forensic folks tried to get into the phone. And so when they. . . Did you try within 14 days? Does the record show that the search was begun, that an effort was made within the first 14 days? I think, Your Honor, that the record shows that the investigators were trying to. . . were making efforts to try to get into this phone. Into this phone? And they later determined that they couldn't get into the phone. Within the first 14 days, someone tried to get into this phone? I didn't think. . . I don't know that the record is entirely clear about that kind of timing. I thought I remember a filing from the government saying, look, we had a lot of stuff to do, so we didn't even get to this phone for a pretty long time. May I answer, Your Honor? Yes. The government indicated that to give the district court an idea of what was going on, as Mr. Harding just alluded to, this was a 44 defendant case. And for a time, it appeared that Mr. Poehler's case would resolve. So the government was trying to explain that there was certainly a lot of stuff going on, but the government was making efforts to get into all of the electronic devices. There had been multiple electronic devices that were recovered in this case. Look, I understand as a practical matter that there's no real concern that the probable cause went stale in this case, right? You guys had the phone. Whatever was on the phone was going to be on the phone on day one and on day 1,000. Nothing was going to change here. But I'm concerned. It seemed to me that in your brief, you were arguing for a very broad rule that the fact that a warrant is executed after its expiration date per se does not raise any constitutional problems. Is that your position? It doesn't raise any constitutional problems, Your Honor. Other circuits have found where the probable cause still exists, and there's no indication. But who makes the judgment that probable cause still exists? As Your Honor pointed out, this is a phone that in this case, with this phone in particular, and I would say with electronic devices in general, but you need not reach that broader rule. But with this phone in particular, once they had the phone, the contents on the phone were never going to change. So it wasn't like a house where whatever's in the house may change on a daily basis. Once they had the phone, the probable cause, as Your Honor points out, exists on day one. It exists on day 40. I don't want to take up too much of your time. The only thing I'm trying to do is clarify the government's position. It seemed to me from your brief that you were taking at least that your first argument was a very broad argument, that even if you're searching a house and the warrant says you have to execute the warrant by April 14th, you can go ahead and search that house on April 15th, and that's not going to raise any constitutional problems. You may have a rules violation, but it's not a constitutional problem. But I understand your argument in front of us now to be much narrower than that. Am I right?  Okay. All right. Thank you, ma'am. Thank you. Mr. Martyrs, gas and time. Thank you. Judge Harris, Judge Hollander's ruling on the Paylor motion is found at ECF 1205. It is in Volume 1 of the Joint Appendix. It's dated 11-13-2014. The government suggested in its remarks that the defendant had agreed to the joint instructions and therefore we have given up our right to complain, and that is absolutely false. We did not agree to the joint instructions. We submitted our own instructions. We submitted separate instructions. We tried to argue the flaws in the government's instructions. We were denied that. And then after the charge conference, we filed a letter, which is ECF 1352, and I apologize that it's not in the Joint Appendix. We filed a letter that said we've now looked at the government's sand book and we've determined that we cannot agree to anything the government has said come straight out of sand because whatever is in that book is not current, is not accurate. So we were very clear that we did not agree with the government's instruction. We submitted in October 2014 the correct instruction, and the judge decided that he was just going to do what the government said, and that's why this case is so significant because it really comes down to a question of trust. The way I started my argument that this was outrageous. Why was it called a joint instruction if it wasn't joint? Well, because at the time, we were told that this was straight out of sand. We took the sand instructions. So was it joint or not joint at that point? At that point, I believe it was joint. Okay. But it was incorrect. So it was based on a misrepresentation as to what was in there, and therefore our assent was not valid. And as soon as we found that out, we corrected it with the court. The way I opened my original argument, although it may have sounded like an advocate's quotation, it was not. What I was quoting was the district court judge. This was Judge Motz who was saying that he was disappointed, that the U.S. Attorney's Office should be ashamed of itself, that the court had been let down. And that, my position is, is the centerpiece of this, that there has to be some level of trust from the United States Attorney's Office. The court has to be able to rely on what the United States Attorney's Office says is straight out of sand, is word for word from sand. Not only did they say it was word for word, they said we didn't modify them. And the district court has to be able to rely on that. And for the government to come in and give a knowingly incorrect instruction and then argue it repeatedly throughout the trial, and the government's suggestion that it didn't affect the evidence is simply incorrect. Because what happened was we objected to, for example, introduction of evidence with regard to the sexual relations. And the government said that's part of the racketeering conspiracy. And because the government had told the judge that all of the 161 overt acts were part of the racketeering, the judge let that stuff in. So it did affect it. And then the government would do this very creatively. They would say, no, you pled to racketeering conspiracy, right? Okay, well, let's talk about the overt acts that you committed. They tied them together repeatedly. There was no question that these were the same. And then in their closing argument, they said at the end of the case, the judge will ask you to find that at least two overt acts were committed by somebody and further into this conspiracy. So there's no question that this was persistent throughout the trial. I'm sorry, that last quote you just read, I mean, and I really have been struggling to try to understand what was going on here, but that last quote is entirely consistent with a different problem, not that people were conflating racketeering acts and overt acts, but that there was a misunderstanding as to whether you needed overt acts in addition to racketeering acts. Actually, with all due respect, Your Honor, I think there was a misstatement misleading by the government that you didn't need racketeering, that the overt acts were. I'm sorry, the last thing you just read was the judge is going to ask you to find two overt acts. That doesn't, you didn't read something that said, and no racketeering acts. That's correct. Okay. And that's because in other portions of the rebuttal argument, the government had said, the government would say overt acts, and the judge said, well, you mean racketeering acts. And they basically said, well, they're the same thing. And that's what the problem was. The judge thought they were the same. In fact, when he responded to the juror's notes, he said, you're making factual findings, you need to answer the question about racketeering acts, which are sort of listed as overt acts. So these two things were equated by the government to begin with, and then ultimately by the court repeatedly. So it did affect the evidence of the trial. It did affect the way the trial went. When he answers the jury's question, Yes, ma'am. the answer to your question is that you have to find racketeering acts, the A through F acts. And then he says, you also, you must find that at least two of the overt acts were committed as well. Where are you? 2248. Am I looking at the wrong thing? Well, yes. So what happens is he instructs the jury once, they go out, he instructs the jury again on the same issue. This is after he gets the jury's note. I thought that's what you were talking about. There's actually two different instructions. If you look at Joint Appendix 2243, he brings the jury in, and that's when he says, I hope my answer doesn't confuse you too much. And at the end of that, he says he's not going to ask you to list them. When you answer the question about racketeering acts, that you are making factual findings which are sort of listed in the overt acts. And so he kept referring to the two things together as if they were the same, and they clearly are not. And the idea here is that racketeering acts is a statutory, it's not a complicated issue. The statute says here are the specific acts. And there's nothing in there about bringing tobacco into a jail. There's nothing in there about opening cells to allow inmates to do things. Those are not racketeering acts. And the jury needed to be told that. And because the court was misled from the beginning and told that this instruction was correct, the judge led in evidence to that effect, the judge allowed argument to that effect. And I would like to point out, it is true that we did not take the opportunity to re-argue, but that was only given to us if the government was going to be allowed to have opening argument and rebuttal argument if we were going to re-argue. And having sat through three hours of the government's arguments, we decided as a group that that would not be good for us and probably not beneficial to the jury. So it wasn't like we were given, we asked. We said we should be allowed to re-argue because this is the government's fault. In fact, the judge said when he came out in the hearing after all this blew up, he said, I'm going to bend over backwards for the defense. So we said, well, let us re-argue. He said, well, no, not really. If you're going to do it, then they get opening and they get rebuttal, and we decided not to do that. So, Your Honor, I believe this case comes down to a question of trust. We have to be able to trust the U.S. Attorney's Office. I'm all for criminal prosecutions. I'm all for, I'm a CJA attorney. It's a wonderful thing, but they need to be fair, and we need to be able to say what the U.S. Attorney's Office is saying is correct. And when they make a mistake, they need to correct it and not persist in it to the point where both the judge and the instructions to the jury confused these very important issues. Thank you, sir. Thank you very much. I note that you're court-appointed and the court appreciates your service. You're welcome, Your Honor. We'll come down and recount.
judges: Henry F. Floyd, Pamela A. Harris, John Preston Bailey